**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**REX AND EVERLY HATFIELD,**

**Defendants.**                                              **No. 08-30020-DRH**

<u>**MEMORANDUM AND ORDER**</u>

**HERNDON, Chief Judge:**

## I.   <u>Introduction</u>

Before the Court is Defendants Rex and Everly Hatfield's Motion for New Trial Based on Newly Discovered Evidence (Doc. 292).  Specifically, Defendants seek a new trial pursuant to **FED.R.CRIM.P. 33(b)** due to the Government's alleged *Brady* and *Napue* violations.  The Government has filed a response in opposition to the motion (Doc. 304).  On September 10, 2010, the Court held an evidentiary hearing and heard testimony and further arguments from the parties.  After having reviewed the arguments and the testimony at the evidentiary hearing, the Court rules as follows.

## II.   <u>Background</u>

### A.   **Trial and Appeal**

Rex and Everly Hatfield were indicted on two counts of conspiracy to commit pharmacy robberies in violation of 18 U.S.C. §§ 2118(b) and (d) and conspiracy to distribute and possess with intent to distribute controlled substances,

namely morphine, methadone, oxycodone, fentanyl, alprazolam, cocaine, and hydrocodone, in violation of **21 U.S.C. §§ 841(a)** and **841(b)(1)(C)**, all in violation of **21 U.S.C. § 846.**   Count II also alleged that the distribution of those drugs resulted in the death or serious bodily injury of six individuals (Doc. 43).   The jury returned a guilty verdict on both counts on October 29, 2008 (Docs. 170-181).   In finding both Defendants guilty of conspiracy to distribute and possess with intent to distribute, the jury found that the distribution of controlled substances to several individuals by the Defendants resulted in the death  of Carol S. Walker (Docs. 176 & 178) and the serious bodily injury of  Richard Ward (Docs. 177 & 181).   The jury also found that drugs distributed by Rex Hatfield led to the death of Deborah Ann Smith (Doc. 174) and Mark D. Honaker (Doc. 175).   Further, the drugs distributed by Everly Hatfield led to the death of Jimmy L. Dishmon (Doc. 180).   However, the jury found that drugs distributed to Christopher P. Allen did not result in death (Doc. 179).

Defendants filed an appeal challenging several of this Court's rulings. In particular, the Defendants challenged the wording of the special jury instruction of the meaning of the statutory term "resulting from" as it related to the distribution counts.   Further, Defendants challenged one of the special verdict forms which omitted the date of the overdose which Defendants argued "constructively amended" the Indictment, the allowance of a certified document from a dismissed case involving one of the Defendants used by the Government to back up its argument that the Defendants planned to kill one of the individuals, and the disallowance of statements

by an individual who had claimed he had committed one of the burglaries the Defendants were charged with.

The Seventh Circuit affirmed the Court's ruling on the witness testimony, special verdict form, and documents from the dismissed case. However, in regards to the jury instruction on the deaths resulting from language, the Seventh Circuit found that the additional language in the instruction did not "[contribute] to the understanding of causation" and made the statutory language less clear. *United States v. Hatfield*, **591 F.3d 945, 949 (7th Cir. 2010)**. Finding that the instruction was given in error, the Seventh Circuit remanded the case back to this Court to be retried on the "results from" charge only. The Seventh Circuit upheld the jury's findings on the other counts as the convictions for conspiracy to burglarize pharmacies and distribute controlled substances "were supported by overwhelming evidence unrelated to the evidence of the causes of the injury and deaths." *Id.* at **953.**

On remand, the Government sought to dismiss the "resulting from" portions of the Indictment (Doc. 279). The Defendants objected to the dismissal of the allegations, but the Court granted the Government's request and dismissed all of the "resulting from" allegations and set the case for re-sentencing. Subsequently, Defendants filed a motion for new trial based on newly discovered evidence (Doc. 292) which is currently pending before the Court.

**B.    Motion for New Trial**

Specifically, in Defendants' motion for new trial, the Defendants seek a new trial for what they allege are ***Brady*** and ***Napue*** violations by the Government in failing to turn over registration records at the Knights Inn, formerly the Econo Lodge, the Hatfields were allegedly staying at the night before Jimmy Dishmon's death. Further, Defendants argue that the Government failed to correct Pamela Hatfield and Shiela Acklin's testimony regarding whether they registered at the hotel on the night in question even though the Government knew the testimony to be false.

In regards to the ***Brady*** violation, Defendants allege that the Government obtained registration records from the hotel in question which showed that none of the Defendants, nor any of their accomplices, were registered at the hotel on the night before Jimmy Dishmon's death. The Government, or more specifically the DEA agents, had those documents in their position before trial and as early as 2006. Further, Defendants allege that the Government violated ***Napue*** when the Government allowed two witnesses, Pamela Hatfield and Shiela Acklin, to testify falsely, testifying that they did, in fact, stay in the hotel on the books and that one of them registered at the hotel. Defendants argue that the Government knew the evidence was false but never sought to correct the testimony or to inform the Defendants.

**C.    Evidentiary Hearing**

At the evidentiary hearing, the parties stipulated that the DEA received

the hotel records from the owner, Mr. Ronald Mann, in 2006 but returned them on April 10, 2006.  However, prior to the trial, the DEA reacquired the documents sometime in May of 2008 and mailed the documents back once the trial ended in October 2008.  The Defendants also argued that while they had received discovery regarding the Defendant's stay in July 2003, they did not receive information about the night at issue.  Defendants also pointed out that the discovery originally produced by the Government sometime in February or March of 2006 in two DEA-6 reports[1] showed that the events at issue took place at an Econo Lodge in Cool Ridge, West Virginia.  In actuality, however, the Econo Lodge was not located in Cool Ridge but in Ghent, West Virginia and was no longer an Econo Lodge but had been renamed a Knights Inn, making any due diligence, arguably, on the Defendants' part impossible to uncover the exact location of the hotel at issue.  Defendants' counsel further pointed out that even if his due diligence had uncovered the actual name and location of the hotel, Mr. Mann no longer had the  proper documents as they were in the sole possession of the Government.

On the stand, Mr. Mann testified that even though he had sold the hotel after twenty years of ownership, he still maintained all of the records and registration going back to 1987.  While he did not remember the exact date, he recalled that two DEA agents contacted him and went through his records sometime in 2007.  Further,

---

[1]  The DEA-6 reports were from two proffers, one containing a statement from Sheila Acklin and the other consisted of Pamela Hatfield's statement.  The Reports stated that both had informed the DEA that on the night before Jimmy Dishmon's death, they had rented a hotel room at the Econo Lodge in Cool Ridge, West Virginia.

he recalled that the records were obtained sometime before the trial.  He believed that all of his employees were truthful and that the manager on duty that night, Justin Farley, was truthful, trustworthy, and honest.  He also testified that it would not have been appropriate, nor would he have allowed, any of his managers to rent out rooms to people off the books nor could he recall when any such guests stayed at the hotel without registering.  He also acknowledged that the daily auditor for September 8, 2003 was Ron Hatfield, although he doesn't remember that employee specifically and the auditor report would have been prepared by the auditor on duty on September 9, 2003.

The night manager on duty on September 8, 2003, Justin Farley, confirmed that Ron Hatfield had to have worked on September 9, 2003 in order to have filled out the audit reports from the night before as all reports from the previous night were filed by the managers on duty the subsequent night.  Further, he denied allowing anyone to stay at the hotel without registering and denied allowing Defendants to stay.  He also stated that he relied on only the records when filling out the audit forms and did not check each individual room.

Jimmy Dishmon's daughter and son also took the stand to testify as to their father's whereabouts on the night before his death.  Mr. Dishmon's daughter, Whisper Dishmon, testified that her father had been at home the whole night before his death.  She recalled that her father was remodeling their bathroom on the night of September 8th.  She recalled talking to him that night as he worked on the bathroom.  She also recalled that he laid down for awhile due to a pain he had

developed in his arm.  When she got up for school the next day between 4:30 and 5:00, she remembered speaking with her father because he told her he had purchased an electric tooth brush.  She recalled that it was unusual for him to be up that early as he was not usually up when she got ready for school.  It was not until she came home from school that day that she found her parents in their bedroom asleep.  She testified that she woke her mother up but that her mother came out of the bedroom to tell her that something was wrong with her father and that she went back to her parents bedroom and found her father not breathing, with blood around his mouth.

On cross-examination, she denied ever telling her father's sister that she would back her mother and her uncles and would do whatever she could to help them.  She admitted that she did not tell the defense before trial about her encounter with her father on the night before his death because no one ever asked her and she felt that she was just a kid.  She also stated that she did not remember seeing any pills around her father when she found him in bed and did not recall hearing her mother say that she was going to help get her brothers off and that Whisper and her brother would help.  She also denied that her mother sold pills.

Whisper's brother, Jimmy Dishmon II, also testified to seeing his father at his house the night before his death.  He recalled seeing his father between 11:00 and 11:30 the night before his death.  He had been playing video games at a cousin's house all day had was going to spend the night with his cousin so he stopped by the house to ask his father's permission to stay out all night.  He recalled his father was

in the back bedroom and he told him Mars was visible that night as they both enjoyed astronomy. He also stated that he rarely saw his uncles, Rex and Everly, and had only met Pam on a couple of occasions. He denied that his mother used pills or sold them and was unaware that his uncles sold pills. He also denied telling his aunts that Rex and Everly had approached him at his father's funeral and offered him a cut of their next drug run.

Loria Farruggia, Jimmy Dishmon's sister, also testified regarding her brother's death. She recalled speaking to Whisper on the phone less than two weeks after Jimmy's death and that Whisper told her that she would do whatever it took to protect her uncles because she knew they were not involved.

Another of Jimmy Dishmon's sisters, Leisha Dismon, recalled that a few days after her brother's death, his son Jimmy stated that he was proud of himself for not taking his Uncle Rex and Everly's offer for half of the proceeds from their next drug run. She also recalled talking with Whisper on the evening of Jimmy Dishmon's death. She remembered Whisper telling her that Jimmy was crying because of an argument he had with his wife Beverly over her involvement with her brothers, Rex and Everly. Leisha later testified that while Whisper never said when she saw her father crying, she assumed it was on the morning of his death.

Next, Mr. Pierce, Assistant Chief of Police, testified that he was among the first officers at Jimmy Dishmon's house after his death. Arriving at the scene, he believed that Mr. Dishmon had been deceased for some time as his entire body had turned blue. He also recalled searching the room and finding numerous pills, pill

bottles, and what he believed were "snort straws" although he did not find any crushed pills. On cross, he acknowledged that the straws he found were in an empty bottle of Listerine.

Pamela Hatfield also testified about the night before Jimmy Dishmon's death. She testified that although she had stated in the original trial that she had registered at the Econo Lodge the night before Jimmy Dishmon's death, that she in fact did not register but had obtained the rooms through a deal with an employee who allowed them to stay without registering in exchange for drugs. While she said the employee was one of Rex Hatfield's cousins she could not recall his exact name although his last name was Hatfield as well. She recalled that she obtained drugs from Rex and Everly and gave the drugs to Rex's cousin in the laundry room of the hotel. In the exchange, she testified that they received two hotel rooms and were allowed to stay as long as they wanted although they only stayed two nights. They were able to access the rooms through a key that Rex's cousin gave them and they went in and out of the hotel through a side exit so as not to be seen by the staff on duty. She stated that she had told Special Agent Moore and AUSA Garrison that they had stayed off the books but at trial she had testified that she had registered because she was nervous and had went over so many different issues and hours of discussion and the issue of whether they had registered at the Econo Lodge had only been a brief topic of discussion.

On cross, Pamela reluctantly admitted that her cooperation might have played a role in the Government's motion at her sentencing to reduce her sentence.

She also admitted that during her first proffer she had told the agent that she had rented the room, although she stated to her "renting" meant just getting the room and did not entail how she paid for the room. She admitted in her first proffer she did not say that she had traded pills for the room.

Sheila Acklin also testified that they did not register at the Econo Lodge on the night in question but that Pamela Hatfield gave them a key to her and Everly's room. She could not recall how long she stayed at the hotel, but thought it was a couple of days. She recalled that Pamela told her that she knew someone in the hotel who would let them stay there in exchange for drugs. She also remembered that she and Everly did not have to give Pamela money for the room which they usually had to when renting a room. She acknowledged that she testified at trial that she "bought" the room from Pamela but in actuality she did not register and Everly gave Pamela pills to pay for the room. She also confirmed that she used a side door to get to the hotel rooms and never encountered a desk clerk or maid.

On cross examination Sheila acknowledged that she had originally told Agent Moore that she had rented the room, and it was not til a later session that she informed the agent that Pamela had obtained the room. She testified that a lot of events from that time were jumbled in her mind. She did remember that Agent Moore had conversed with her sometime before trial and told her that the records from the hotel showed that she had not registered and that's when she recalled that Pamela had obtained the rooms through a drug transfer. Although she testified at trial that Pamela had "bought" the rooms she meant that they had been paid for with

drugs.  She remembered asking Pamela why she didn't need money to pay for the rooms and Pamela had told her that she had paid someone she knew for the room with drugs.

The final witness, Agent Moore testified that he had obtained the records from the hotel sometime in 2006 but mailed them back sometime in 2006.  The records were not located and obtained again until May 13, 2008 before the trial in October.  He was never contacted by the owner Mr. Mann or anyone from the Defense requesting to view the documents.  On cross, he denied that he had confronted either Pamela Hatfield or Sheila Acklin with the register records from the hotel as he had never taken the records anywhere with him.  He admitted that he spent several hours with both witnesses, more than ten hours, but had only talked about the Econo Lodge for a few minutes.

### III.  Discussion

**A.    Motion for New Trial**

Under **FEDERAL RULE OF CRIMINAL PROCEDURE 33(a)**, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires."  The burden is on the defendant to show that the interest of justice requires retrial. *United States v. McGee*, **408 F.3d 966, 979 (7th Cir. 2005)**.  "[O]n a motion for a new trial,... the Court may reweigh evidence, taking into account the credibility of the witnesses."  *United States v. Washington*, **184 F.3d 653, 658 (7th Cir. 1999), *cert. denied*, *Washington v. United States*, 533 U.S. 961, 121 S.Ct.**

**2617, 150 L.Ed.2d 771 (2001)**.  If the court reaches the conclusion that "there is a serious danger that a miscarriage of justice has occurred- that is, that an innocent person has been convicted - it has the power to set the verdict aside"; however, **Rule 33's** conferral of discretion on the district court is not a license to abuse it.  ***United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994),** *r'hrng. denied* **(citing *United States v. Morales*, 902 F.2d 604, 605-06 (7th Cir. 1990),** *amended***, *United States v. Morales*, 910 F.2d 467 (7th Cir. 1990))**.  The motion is addressed to the discretion of the court, and the power to grant a new trial should be exercised with caution and invoked only in the most extreme cases.  ***Id.; United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998),** *cert. denied , Lindwood v. United States,* **525 U.S. 897, 119 S.Ct. 224, 142 L.Ed.2d 184 (1998)(citations omitted)**.

Any motion for a new trial filed more than seven days after the verdict is too late.  ***See* Fed.R.Crim.P. 33(b)(2);** *McGee***, 408 F3d at 979;** *Washington***, 184 F.3d at 659**.  Only **Rule 33** motions grounded on new evidence have longer time limits.  ***United States v. Cavender*, 228 F.3d 792, 802 (7th cir. 2000)**.  To prevail on a motion for new trial based on newly discovered evidence, a defendant must show that (1) that he became aware of the evidence only after trial; (2) he could not, by exercising due diligence, have discovered it sooner; (3) the evidence is material; and (4) in the event of a new trial, the evidence would probably lead to an acquittal.  ***See United States v. Hodges*, 315 F.3d 794, 801 (7th Cir. 2003);** *United States*

*v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007).

**B.      Analysis**

Here, Defendants point to newly discovered evidence which Defendants have recently uncovered, but which they argue had originally been withheld from Defendants by the Government in violation of **Brady** and **Napue**.  The evidence consists of registration records from the hotel which Defendants were allegedly staying at the night before Jimmy Dishmon's death.  The registration records show that on the night in question, neither Sheila Acklin, Pamela Hatfield, nor either of the Defendants were registered at the motel.  Further, Defendants allege that the Government failed to correct the testimony of Sheila Acklin and Pamela Hatfield when they testified at trial that they were registered at the motel the evening before Jimmy Dishmon's death.

**1.      *Brady* Violations**

Defendants first allege that the Government violated **Brady v. Maryland**, 373 U.S. 83 (1963) by failing to turn over the registration records from the Econo Lodge in Ghent, WV.  The documents were never produced before or during trial, yet were in the Government's possession at some point before trial in 2006 and then reacquired by the Government in May 2008 and held by them until after the trial.

**Brady v. Maryland**, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 **(1963)** stands for the principle that the Government has an "affirmative duty to

disclose evidence favorable to a defendant and material either to guilt or punishment." ***United States v. Fallon***, **348 F.3d 248, 251 (7th Cir. 2003) (citing *United States v. Gonzalez*, 93 F.3d 311, 315 (7th Cir. 1996))**.  In order to obtain a new trial for the Government's violations of its obligations under ***Brady***, a Defendant must establish:

> (1) that the prosecution suppressed evidence;
> (2) that the evidence was favorable to the defense; and
> (3) that the evidence was material to an issue at trial.

***United States v. Bland***, **517 F.3d 930, 934 (7th Cir. 2008) (quoting *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995)).  *See also United States v. Payne*, 102 F.3d 289, 293 (7th Cir. 1996); *United States v. Baker*, 453 F.3d 419, 422 (7th Cir. 2006); *United States v. Palivos*, 486 F.3d 250, 255 (7th Cir. 2007); *United States v. Are*, 590 F.3d 499, 510 (7th Cir. 2009).**   The evidence is considered suppressed if "(1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence."  ***Are***, **590 F.3d at 510 (quoting *United States v. O'hara*, 301 F.3d 563, 569 (7th Cir. 2002)).**  A ***Brady*** violation can occur even if the Government fails to turn over evidence only known to the police and not the Government's prosecutor.  ***Carvajal v. Dominguez***, **542 F.3d 561, 566 (7th Cir. 2008) (citing *Youngblood v. West Virginia*, 547 U.S. 867, 870, 126 S.Ct. 2188, 165 L.Ed.2d 269 (2006)).**

Under the third prong, "[e]vidence is material if there is a 'reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Pavilos*, 486 F.3d at 255 (quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 8 L.Ed.2d 481 (1985)). Failure to turn over impeachment evidence can also result in a *Brady* violation. *Id.* Whether impeachment evidence constitutes a *Brady* violation depends on numerous factors, the most important being the strength of the other evidence against the defendant. *United States v. Lewis*, 567 F.3d 322, 328 (7th Cir. 2009).

Here, the Defendants clearly meet the first two prongs of the test. The Government had evidence in their position which showed that neither Defendants nor Sheila Acklin and Pamela Hatfield were registered at the Econo Lodge in Ghent, West Virginia, the night before Jimmy Dishmon's death. The Government turned over the DEA-6 which stated that the Defendants had rented a room at a hotel in Cool Ridge, yet the records from the motel did not reflect that alleged registration. The violation became even more clear when both witnesses told the Government that they had not registered at the Econo Lodge but had stayed there off the books in exchange for drugs. This testimony was in direct contradiction with the DEA-6 which stated that they had registered at the motel and thus, the register was favorable to the Defendants as impeaching evidence. The Government's failure to disclose the motel's register after both witnesses changed details of the story, amounted to a violation of *Brady*.

Further, the Court finds that the evidence could not have been

discovered by Defendants through the course of due diligence.  As pointed out by Defendants at the evidentiary hearing, Defendants were only informed by the Government through the DEA-6 report that Defendants had registered at an Econo Lodge in Cool Ridge, West Virginia when in fact the motel was located in Ghent, West Virginia and had subsequently transferred ownership and converted to a Knight's Inn, making identification of the proper motel extremely difficult.  It was not until trial that it was revealed that the motel at issue was now a Knight's Inn in Ghent, West Virginia.  Even if Defendants had been able to determine the exact location and identification of the motel in question, the Government had possession of the records at numerous points before and, in particularly, obtained the documents within three months of disclosure of the DEA-6.  The Government possessed the documents and were in a better position to suppress them.  Clearly, the first two prongs of the ***Brady*** test have been met in that the Government had an obligation to turn over the register to the Defendants, but failed to do so, and the Defendants could not have discovered the documents through due diligence.

   2.   ***Napue* Violations**

Defendants also argue that the failure of the Government to turn over the records or to correct Pamela Hatfield's testimony that she registered at the motel, when in fact she was not registered, on the evening in question resulted in a violation of ***Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)**.  "*Napue* stands for the proposition that prosecutors may not suborn perjury."  ***Are,***

**590 F.3d at 509 (quoting *United States v. Holt*, 486 F.3d 997, 1003 (7th Cir. 2007)).**  It also "extends to false testimony that goes to" a witnesses' credibility.  ***Id.* (citing *Napue*, 360 U.S. at 269, 79 S.Ct. 1173).**  However, prosecutors are not required to bring forth exculpatory evidence in their case-in-chief.  ***Holt*, 486 F.3d at 1003.**  Under the standard set forth in ***Napue***, "when a prosecutor knowingly relied on false testimony, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judge of the jury." ***Are*, 590 F.3d at 509 (quoting *Braun v. Powell*, 227 F.3d 908, 920 (7th Cir. 2000) (quotations omitted)).**

The Court also finds that the Government violated ***Napue*** when it failed to turn over the register or correct Pamela Hatfield's testimony.  At trial, Pamela Hatfield testified that she had registered at the hotel when in fact she had informed the Government at an earlier point that she had stayed at the motel off the books by trading drugs with a relative of the Hatfield's.  The Government has admitted that it anticipated that at trial both Pamela Hatfield and Shiela Acklin would testify that they stayed at the Knight's Inn "off the books", however, at trial Pamela testified that she had registered at the motel.  Once Pamela testified that she had registered at the motel, a ***Napue*** issue arose because she testified differently than how the Government anticipated and the Government failed to correct that testimony or provide the Defendants with the register which showed that she, in fact, had not registered on that night.

### 3.    Materiality

While the Court has found that the Government violated both **Brady** and **Napue** by failing to disclose the motel registration from the night and question, that finding does not necessarily result in a new trial.  Both **Brady** and **Napue** require a finding that the violations have some affect on the judgment before the violations result in a new trial.  Under the standard set forth in **Napue**, "when a prosecutor knowingly relies on false testimony, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." **Are**, **590 F.3d at 509 (quoting** **Braun v. Powell**, **227 F.3d 908, 920 (7th Cir. 2000) (quotations omitted))**.  Under **Brady's** third prong, "[e]vidence is material [and thus results in a new trial] f there is a 'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" **Pavilos**, **486 F.3d at 255 (quoting** **United States v. Bagley**, **473 U.S. 667, 682, 105 S.Ct. 3375, 8 L.Ed.2d 481 (1985))**.

However, the Seventh Circuit has stated in the past that the standard in **Brady** and **Napue** are the same when the failure to correct the false statement was in no distinct way different from the **Brady** violation.  **Mataya v. Kingston**, **371 F.3d 353, 358-59 (7th Cir. 2004) (Napue** and **Brady** violations "likely to merge in a case such as this in which the value of the withheld evidence to the defense was its potential utility for impeaching the government's witness as a liar.")**. While later acknowledging that the standards were distinct but that in **Mataya** the

standards merged, the Seventh Circuit has never formally addressed whether the standard is indeed the same when the ***Napue*** violation arises out of a ***Brady*** violation. ***Are*, 590 F.3d at 509 (finding that the dispute in case law need not be resolved as Defendant failed to meet even the most favorable standard and could prove neither a *Napue* nor a *Brady* violation)**.

As in ***Are***, the Court here need not determine which standard best applies in this situation as Defendants have failed to meet even the most favorable of the two standards.  As to the ***Napue*** violation, the Court finds that no perjury was committed as it was evident that Pamela did not intend to testify wrongly.  As was made clear from her testimony at the evidentiary hearing, Pamela simply did not understand the terminology.  Although she said that she registered at the motel, in actuality, she had allegedly bartered for the room with drugs instead of actually purchased or rented the room in exchange for cash.  Both she and Sheila Acklin used the words "got", "bought", and "rented" interchangeably at the evidentiary hearing.  As Pamela testified, to her renting just meant "getting the room" but did not describe how she paid for that room.  Sheila also testified at the evidentiary hearing that while she might have said "bought" she did not describe the payment.

Further, Sheila, in particular, testified that events sometimes become jumbled in her mind.  Both witnesses were partying with Defendants and doing drugs heavily on numerous occasions, both on the night in question and numerous nights before and after that night.  While they may not have been specific on the hotel or the

exact location of the events leading up to Jimmy Dishmon's death, the location of events does not matter for the actions charged in the Indictment.  No witness will get every minute detail right, and it is not clear to this Court that the details of where the Defendants were and how the hotel rooms were obtained does not affect the ultimate findings of the jury.  Further, the Court finds no evidence that the witnesses were untruthful or operating under ill motive either at trial or during the evidentiary hearing.  The Court found both Sheila and Pamela to be reliable and credible witnesses, albeit easily led by leading questions on cross.  However, their testimony held up and was deemed credible to the jury even under heavy cross-examination and impeaching evidence.

In contrast, the Court found the testimony of the Defendants' additional witnesses, Whisper Dishmon and Jimmy Dishmon II, to be totally unreliable on the issue of Jimmy Dishmon's death.  The Court found their motives to be suspect as they are related to the Defendants.  Both Defendants are Whisper and Jimmy's uncles as their mother, Beverly Dishmon, is the Defendants' sister.  While both witnesses tried to downplay their relationships with their uncles, stating that they rarely saw them and had no desire to help them in their trials, the Government presented evidence to the contrary.  Both  Loria Farruggia and Leisha Dishmon, the deceased's sisters, testified as to Whisper and Jimmy's ill motive.  Loria testified that Whisper had told her in a phone call that she would do everything she could to protect her uncles.  On the other hand, Leisha testified that Whisper had told her that her father had been fighting with her mother about her involvement with her brothers.  She also

testified that Jimmy stated that his uncles had offered him a cut of their next drug run.  Not only did the Court find Whisper and Jimmy's motives to be suspect, but their demeanor also confirmed their unreliability.   In particular, the court noted that when Jimmy Dishmon was on the stand his neck started turning red on cross-examination, an indication to this Court that the witness was lying.

Not only were Sheila and Pamela credible witnesses, but both witnesses were effectively cross-examined and impeached on numerous issues and the impeachment had no effect on the jury's findings as to Jimmy Dishmon's death.  Specifically, Sheila was cross-examined on her prior convictions, use of false identities, and drug addictions.   Mr. Williams discussed her cooperating plea agreement and promise of a recommendation from the Government for a reduced sentence if she testified and cooperated. The Defense went over numerous details of the burglaries and her inconsistent statements and changing stories from previous trials of other co-defendants.  In particular, she was grilled on the inconsistent dates she gave in a previous trial regarding the first time they went on the road together and she was heavily cross-examined on the map book allegedly used during the robbery trips.  She was also cross-examined on the various deaths that Defendants were charged with, in particular the death of Jimmy Dishmon.  Defense counsel cross-examined her heavily on the night they spent at the Econo Lodge, the amount of drugs she was doing that night, and her awareness of that night due to her drug use.  Further, Pamela Hatfield was also impeached on her criminal history and her cooperation and plea agreement with the Government.  She was questioned about

her drug abuse.  She also was heavily cross-examined by Attorney Butts on the night of Jimmy Dishmon's death and by Attorney Williams on the various burglaries.

The addition of further impeachment evidence, namely the registration records from the Econo Lodge, would be nothing more than cumulative to the various impeachment evidence presented by the Defense against Sheila and Pamela. ***See United States v. Ervin*, 540 F.3d 623, 632 (7th Cir. 2008) (evidence of witnesses prior misconduct was merely cumulative evidence which caused Brady claims to fail as "Brady does not extend to '[e]vidence that impeaches an already thoroughly impeached witness.'" (quoting *United States v. Kozinski*, 16 F.3d 795, 819 (7th Cir. 1994)).**  Here, it is disingenuous for the Defense to argue that one more piece of impeachment evidence would change the outcome of the trial. ***Id.* (citing *United States v. Senn*, 129 F.3d 886, 893 (7th Cir. 1997) ("Because the defendants did impeach [the witness] on a number of issues, they can't really make a convincing argument that additional impeachment had a reasonable probability of changing the outcome of the trial.")).**  The issue of where the Defendants were partying on the night of Jimmy Dishmon's death is minor and immaterial to the facts of the case and the events surrounding Jimmy Dishmon's death.   The additional evidence on a minor issue would do little to change the outcome of the trial given the fact that the jury found the witnesses reliable even in the face of the numerous impeaching evidence Defendants' counsel produced.

It is also unlikely that this minor cumulative impeachment evidence

would have changed the juries mind on the death of Jimmy Dishmon given how seriously the jury took their job.  Here, it is clear that the jury weighed the evidence accordingly and gave considerable thought to the evidence presented and the impeachment of certain witnesses.  In particular, the jury weighed the evidence regarding each death separately as evidenced by Defendant's acquittal on the charge in the death of Christopher Allen.  The jury found that the Defendants were not guilty of the death of Christopher Allen.  The jury obviously had the ability to wade through the conflicting testimony throughout this trial and determine which deaths and serious injuries Defendants were liable for.   It is obvious that the jury gave considerable thought to each count of death.  Even given the conflicting evidence and impeachment evidence presented as to Jimmy Dishmon's death, the jury still found the Defendants guilty of that charge.   This Court finds it highly unlikely that additional impeachment evidence on the minor issue of where the Defendants partied or distributed the drugs to Jimmy Dishmon would not change the jury's opinion, particularly given the fact that the location of distribution has nothing to do with the charge.

Even if the **Brady** and **Napue** violations affected the outcome of the trial as to the death of Jimmy Dishmon, it had little to no affect on the other counts of death and serious injury.  The jury found the Defendants guilty of three additional deaths on evidence other than Pamela and Sheila's testimony.  **United States v. Lewis, 567 F.3d 322, 328 (7th Cir. 2009) (The most important factor in**

**determining whether impeachment evidence is material is the strength of the case.  In *Lewis*, the Court found that the witness' testimony at issue was far from the only evidence of the Defendant's guilt); *United States v. Wilson*, 481 F.3d 475, 481 (7th Cir. 2007) (result of the trial would be no different when the evidence was extensive and witness' testimony was far from the only or the best evidence of Defendant's guilt)**.  Here, there was overwhelming evidence as to the Defendants' involvement in the other three deaths.  Specifically, Travis Clark testified about the death of his mother Deborah Smith as he was at the home when she died. He testified that Rex Hatfield distributed hundreds of drugs to both him and his mother and stepfather in the two years before his mother's death and that Rex was their sole distributor.  He testified extensively about her dealings with Rex Hatfield and that on the day of her death that they did not have any drugs at the house until Rex came by and brought pills and the patches that Deborah Smith used just prior to her death.  Deborah Smith's husband, Jeffrey Smith, also testified that Rex Hatfield delivered drugs to them on the day that Deborah died.  As to the death of Carolyn Walker, Joseph Fuston gave credible testimony that Walker received pills from the Hatfields.  He also testified that he had a conversation with Rex and Everly shortly before Walker's death in which Everly stated that she would have to be taken out because she was going to testify against them.  He also recalled both Defendants telling a friend that they would give him drugs in exchange for taking care of a girl that lived in Glen Rodgers. As to Mark Honaker's death, his wife Tammy Duty gave

extensive testimony as to her husband's drug dealings with Rex and Everly Hatfield and the drugs he received from Rex the night before he died.  All the witnesses were credible and additional impeachment evidence on the death of Jimmy Dishmon would have little affect on the jury's view of the other deaths and the statute only requires one death.  *See* **21 U.S.C. § 841(b)(1)(C)**.  Further, there was overwhelming evidence as to the burglaries and distribution charges.

In conclusion, the Court finds that while the Government failed to turn over the hotel register and failed to correct the testimony of Pamela Hatfield and Shiela Acklin when they testified they had registered at the hotel, the Defendants have not shown that the use of that impeaching evidence at trial reasonable likelihood that the evidence could have affected the judgment of the jury or changed the outcome of the trial.  While the Government violated ***Brady*** and ***Napue*** in failing to turn over the register, the Court finds that both Sheila and Pamela were credible witnesses whose testimony would have been unaffected by yet another form of impeachment evidence.  The witnesses' testimony withstood numerous challenges to their credibility and this Court finds it doubtful that the additional challenge would have made a difference.  The jury carefully considered the testimony, impeaching evidence, and credibility of the witnesses in determining Defendant's guilt.  Further, the evidence regarding the other deaths and charges in the Indictment were overwhelming and, in most instances, did not depend on the credibility of Sheila and Pamela.  Therefore, the Court finds that the errors on the Government were not material and thus **DENIES**

Defendants' motion for new trial (Doc. 292).

### IV.  <u>Conclusion</u>

Accordingly, the Court **DENIES** Defendants' Motion for New Trial Based on Newly Discovered Evidence (Doc. 292).

**IT IS SO ORDERED**.

Signed this 2nd day of November, 2010.

David R. Herndon
2010.11.02 16:04:50
-05'00'

**Chief Judge**
**United States District Court**